**ADDAMAX CORPORATION, Plaintiff,**

v.

**OPEN SOFTWARE FOUNDATION, INC., Digital Equipment Corporation, and Hewlett–Packard Company, Defendants.**

**CA. No. 91–11152–JLT.**

United States District Court,
D. Massachusetts.

May 12, 1997.

**550**

Samuel Adams, Ralph T. Lepore, III, Keith C. Long, Warner & Stackpole, Boston, MA, James V. O'Gara, Alan R. Kusinitz, Patricia Oveis Kahn, Kelley, Drye & Warren, New York City, for Addamax Corp.

James C. Burling, Michelle D. Miller, Charles J. Gray, Peter A. Spaeth, Hale & Dorr, Boston, MA, for Open Software Foundation, Inc.

William L. Patton, Eric Jaeger, Ropes & Gray, Boston, MA, Richard H. Alpert, Digital Equipment, Maynard, MA, for Digital Equipment Corp.

Brian A. Davis, Robert S. Frank, Jr., Kevin P. Light, Nicholas J. Nesgos, Choate, Hall & Stewart, Boston, MA, Robert W. Sutis, Hewlett-Packard Co., Palo Alto, CA, Robert A. Skitol, Drinker, Biddle & Reath, Washington, DC, for Hewlett-Packard Co., Inc.

James B. Conroy, Donnelly, Conroy & Gelhaar,Boston, MA, for G2 Computer Intelligence, Inc.

### MEMORANDUM

TAURO, Chief Judge.

Plaintiff, Addamax Corporation ("Addamax"), provides computer security programming to companies which manufacture and market computers. Defendant, Open Software Foundation, Inc. ("OSF"), is a non-profit corporation created, in part, to produce an operating system for use in computers. Defendants, Digital Equipment Corporation ("Digital") and Hewlett–Packard Company ("HP"), develop and sell computer hardware and software. Both Digital and HP were original sponsors of OSF.

Addamax brings this action claiming that Defendants attempted to, and succeeded in, driving it out of a certain segment of the security software market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 7 of the Clayton Act, 15 U.S.C. §§ 14 and 18, Section 12 of the Massachusetts Antitrust Act, M.G.L. ch. 93, §§ 4 and 6, Section 2 of the Massachusetts Unfair Trade Practices Act, M.G.L. ch. 93A, §§ 2 and 11, and the common law of Massachusetts.

The parties agreed to try the issue of damages, jury waived, before the issue of liability. Presently before the court, therefore, is Addamax's claim that Defendants caused it to suffer damages in excess of $50 million.

The computer industry is inherently volatile. The incredible pace of technological innovation creates an environment in which companies without the ability to keep up are likely to fail. And so, the fundamental question presented in this litigation is whether the damage to Addamax's financial stability was caused by its own limitations or, instead, by the improperly anticompetitive conduct of Defendants.

### I.

### COMPUTER INDUSTRY

#### A. Operating Systems

In order for a computer to work, three components are necessary: the hardware, software, and an operating system. The hardware includes the chips, the drives, and the hard-wiring. The software includes the programs that users wish to access. Computer novices best recognize software in the form of "discs."

Here, we are concerned with operating systems, the component that enables a computer's hardware to "read" its software. Without this connecting link, the hardware and software components are useless.

#### B. UNIX

One popular operating system is UNIX. UNIX can be used on many different types of computers. (Amended Complaint, ¶ 8). It is not difficult to convert software originally

intended to run on one computer system using UNIX to another using UNIX. (Defense Exhibit 81 ("DX ——"); DX 2136 at 49989). Also, UNIX is "scalable." (Amended Complaint, ¶ 8). That is, it can be used, in various forms, on personal computers, mainframes, workstations, supercomputers, as well as other forms of computers. *Id.*

AT & T began licensing UNIX to general purpose[1] computer vendors in 1982. (Amended Complaint, ¶ 31). AT & T, at first, did not place many requirements on those wishing to obtain a license. Eventually, however, for a later version of UNIX, AT & T added restrictions to those wishing a license. (Lytle Deposition 6:1077–78; Bell Deposition 1:67). Prospective licensees had to agree to comply with the specifications found in the System V Interface Definition ("SVID"). *Id.* Eventually, pursuant to an agreement between Sun Microsystems, Inc. ("Sun") and AT & T, SVID included a requirement to use certain technology created by Sun. (Joint Exhibit 5 ("JX ——") at A017158).

### C. Security Software

As of 1987, the sellers of computers recognized the need to include security programming with their products. (Comanor Tr.T. 11:137–142 ("Witness Tr. T.——: ")).

A company can submit its security software to the National Computer Security Center ("NCSC") for evaluation. (Chokhani Tr. T. Day 3: pp. 16–19). Software can receive ratings of A, B–3, B–2, B–1, C–2, C–1, and D, ranging from the most secure to the least secure. *Id.* at 3:19. Demand for B-level security software comes, for the most part, from the government. (Beare Tr. T. 5:18, 36–37). Commercial users tend not to need security software above the C-level. *Id.*

The Defense Intelligence Agency of the United States Department of Defense ("DIA") independently rates security software. (Alsberg Tr. T. 6:89). The DIA evaluates the software and decides whether it merits a Compartmented Mode Workstation ("CMW") rating. *Id.* A CMW rating is given to security software that meets B–1 standards and has some additional security features. (Chokhani Tr. T. 3:21–24; Alsberg Tr. T. 6:77; DX 478 at F025640).

### II.

### *INCEPTION OF ADDAMAX*

In 1986, Dr. Peter A. Alsberg created Addamax. (Alsberg Tr. T. 4:6). He wanted to provide the users of the Ada programming language with software. *Id.* But, business did not flourish. *Id.* at 4:120–21; (Howe Tr. T. 2:102). There was little demand for the services and products that Addamax offered. (DX 2248 at 042739; DX 2018 at 014080). In 1987, having used up all of its available capital, Addamax withdrew from the business for which it was originally created. (Alsberg Tr. T. 4:120–21).

### III.

### *ADDAMAX ENTERS A NEW BUSINESS*

Addamax then turned its attention to the production of B–1 level security software for UNIX based computer systems. (DX 2030). As Addamax knew, its new venture was very risky. (Alsberg Tr. T. 4:123; (DX 2046 at 042003)). It faced a limited market size, a narrow window of opportunity, a high cost of development, strong competition, and a weak cash flow. (Alsberg Tr. T. 4:122–125; DX 2030; DX 2036 at 024453–55; DX 2046; DX 2248 at 042776–77). Indeed, Addamax warned its investors of those risks, and of the consequential possibility of losing their investments. (DX 2018; DX 2248; DX 2248 at 042777).

"Start-up" companies are generally high risk propositions. (Howe Tr. T. 2:69). Addamax was typical. It faced a number of obstacles. For example, the government was the major buyer of B–1 security software. If that market disappeared Addamax faced large losses. (DX 2036 at 024453; Plaintiff Exhibit 252 ("PX ——") at 034236). Also,

---

**1.** General purpose computers include mainframes, supercomputers, minicomputers, and workstations. Personal computers are not general purpose computers. (Howe Tr. T. 2:18–20, 79–80).

AT & T already sold a B–1 security system for UNIX based systems. (DX 2050 at 045156). AT & T was a large corporation with many resources, and the creator and licensor of UNIX. Moreover, AT & T had announced that it was going to introduce a B–2 level security system. *See* (DX 2232; Alsberg Tr. T. 6:53–55). This led customers to purchase AT & T's B–1 product, with the expectation of a simple upgrade to B–2 technology. (Alsberg Tr. T. 6:61). Addamax, therefore, was at a great competitive disadvantage. (DX 2038 at 024878; DX 2018 at 014085).

Furthermore, the market for B–1 security was small and fleeting. (DX 2036; DX 2050; Wigel Deposition 1:108; DX 2046 at 041999; DX 2050 at 045156–57; DX 2036 at 024455; Grossman Deposition 1:25–36). As a result, Addamax's president warned that it might sell its B–1 product to only a small handful of customers. (Alsberg Tr. T. 4:125). Addamax was also aware that the lifespan of B–1 technology as a viable product was very short. (DX 2046; Alsberg Tr. T. 5:51–53, 56). It recognized that B–1 technology would soon give way to B–2 technology. *Id.;* (DX 2036). Yet it chose not to pursue the B–2 security system market. (Alsberg Tr. T. 4:125, 6:58–59; DX 246).

## IV.

### OSF

In reaction to the agreement between Sun and AT & T to market UNIX specifically meant for Sun's computer hardware, certain UNIX licensees, with a large market share, formed OSF, (Howe Tr. T. 2:28, 32, 36; Comanor Tr. T. 8:21, 27, 31; Lytle Deposition 1:108, 5:793–94, 804–05, 6:1041–46; Bell Deposition 2:466; JX 25), and announced its formation on May 17, 1988.[2] PX 1210T. The plan was for OSF to create an operating system that would compete with the UNIX/Sun technology partnership. *Id.* That plan led to the creation of the OSF/1 operating system. (DX 185).

OSF recognized the need for security technology for OSF/1, and accepted bids from both Addamax and SecureWare, Inc. ("SecureWare"), another producer of security software for UNIX. (JX 149). OSF, in December 1989, chose SecureWare to supply its B–1 security technology. (Alsberg Tr. T. 4:116).

## V.

### PROBLEMS AT ADDAMAX

Addamax did not have a marketable version of its B–1 product, the B1st Kit, until June 1989. (DX 2043; DX 2761; Alsberg Tr. T. 5:67). This was much later than what Addamax had hoped for and, in fact, much later than Addamax considered necessary for success. (Alsberg Tr. T. 5:56; DX 2031; DX 2246 at 042014). It had originally expected to have its B–1 product available by the middle of 1988. DX 2046 at 041999. That deadline subsequently became a moving target, drifting to September 1988, December 1988, February 1989, and May 1989. (DX 2248 at 042760; DX 2249 at 042912; DX 2200 at 012947; DX 2175 at 005150). Addamax met none of these deadlines. *Id.*

The delay in producing a marketable B–1 product was caused by Addamax's own development, marketing, and business strategies. Addamax had to divert some of its professional staff, and stay development of a B–1 product, in order to keep promises made to customers who had signed license agreements for the B–1 product before it was completed. (Alsberg Tr. T. 5:67–68). Addamax also failed to raise additional capital at the pace it needed. (DX 2249 at 042912).

And so, even before OSF existed, Addamax was having grave financial problems. (*See* Comanor Tr. T. 9:62; Alsberg Tr. T. 5:73). It was suffering from a lack of cash flow and an exhaustion of capital. (Alsberg Tr. T. 6:9–10; DX 2175; DX 2248 at 042776). Five months before OSF selected SecureWare's security software, Addamax closed its office in Rockville, Maryland, cutting its professional staff by almost one third. (Alsberg

---

**2.** Present at the announcement were representatives from International Business Machines, Digital, HP, Siemens A.G., Nixdorf Computer Engineering Corp., Groupe Bull, SA, and Apollo Computer Corporation. (PX 1210T).

Tr. T. 5:74–76; DX 2028; DX 2761; DX 87; Grossman Deposition 1:82–87). Even two months before OSF sought bids for security software, Addamax recognized the need to cut costs even more in order to avoid running out of money by the end of 1989.[3] (Alsberg Tr. T. 4:116, 6:10–11; DX 2026).

In the years preceding OSF's creation, Addamax never realized a profit. (Comanor Tr. T. 9:62; Alsberg Tr. T. 5:73). It suffered operating losses of approximately $167,000 in 1986, $500,000 in 1987, $1,150,000 in 1988, and $2,600,000 in the fiscal year ending in August 1989. (Alsberg Tr. T. 6:19–21; DX 2760; JX 151; JX 152).

Consistent with its lack of profits, Addamax's sales of security software were minimal in the years leading up to the creation of OSF. Addamax had only nine customers for the B1st Kit. (Alsberg Tr. T. 4:113). None of those customers produced substantial income for Addamax. *Id.;* (PX 2174 at D8; Beare Tr. T. 5:20; Alsberg Tr. T. 6:30, 4:56; DX 2731; DX 2745).

## VI.

### *ADDAMAX VS. SECUREWARE*

Perhaps most harmful to Addamax was the fact that it eventually offered a B–1 product that was too expensive and too complex, and that actually exceeded B–1 requirements. (Alsberg Tr. T. 5:55–56; Hartman Deposition 2:494–496; DX 2031). Potential customers did not want to pay for a product that exceeded a B–1 rating. (*See* DX 2030 at 021204–05; DX 257 at 042021). Addamax's up-front fee for a license to use the B1st Kit was originally $600,000. (Alsberg Tr. T. 5:62). That was eight times the cost of AT & T's up-front fee, (DX 257 at 042019; DX 2030 at 021203), and twelve times the up-front fee Secureware charged for its B–1 product. (Alsberg Tr. T. 5:63). Eventually, Addamax was forced to lower its up-front fee to $100,-000. (Alsberg Tr. T. 5:62–64; DX 2029; DX 2030).

**3.** Addamax only had $29,573 in cash at the end of fiscal year 1989. (Alsberg Tr. T. 7:126–130; JX 152).

By contrast, SecureWare offered a cheaper and simpler product. While SecureWare's B–1 product did not have all of the attributes of the B1st Kit, *see* (Comanor Tr. T. 10:34), it met the needs of a customer seeking B–1 level technology.[4] (Alsberg Tr. T. 6:92; McChesney Deposition 6:727–28). SecureWare's B–1 product was also a great deal cheaper than the B1st Kit. (Alsberg Tr. T. 5:63).

The B1st Kit never received an evaluation of B–1 from the NCSC, whereas Secure-Ware's B–1 product did. (Alsberg Tr. T. 7:73; Chokhani Tr. T. 3:98; Sutton Deposition 1:206; JX 74). The B1st Kit did not complete a CMW evaluation with DIA, whereas SecureWare's product did. (Alsberg Tr. T. 6:89, 92; McChesney Deposition 6:727–28).

Contrary to Addamax's contention, even before OSF's selection of SecureWare's security technology, SecureWare was selling its product somewhat effectively. (*See* JX 191; JX 193; JX 195; JX 201; JX 202; JX 206; JX 214; DX 2107; DX 2112). SecureWare had a product more to the liking of the computer industry, due to its price and simplicity. (*See* Comanor Tr. T. 10:34; DX 2030 at 021204–05; DX 257 at 042021).

## VII.

### *ADDAMAX SWITCHES TO CMW*

By 1991, Addamax had, for all intents and purposes, abandoned its B–1 business. (DX 748; Alsberg Tr. T. 6:79–81). Instead, it began to focus on its CMW security product. *Id.* Addamax actually refused to license the Blst Kit to various companies because of this switch. *Id.*

Addamax was quite successful in the CMW market. *See* (Alsberg Tr. T. 6:86–87). It was one of only three companies licensing a CMW product. *Id.* at 6:88; (DX 2058 at 051123). In March 1993, Addamax sold its CMW business. (Alsberg Tr. T. 6:93).

**4.** SecureWare's product actually received both a CMW and a B–1 evaluation. (Alsberg Tr. T. 6:92, 7:73; McChesney Deposition 6:727–28).

## VIII.

### STIPULATION

At the suggestion of this court, the parties agreed to try, jury waived, the damages portion of the trial first. Pursuant to this agreement, the parties stipulated as to Defendants' liability.

For the purposes of this analysis only, therefore, this court assumes that Defendants' actions, as described in the Amended Complaint, were in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 7 of the Clayton Act, 15 U.S.C. §§ 14 and 18, Section 12 of the Massachusetts Antitrust Act, M.G.L. ch. 93, §§ 4 and 6, Section 2 of the Massachusetts Unfair Trade Practices Act, M.G.L. ch. 93A, §§ 2 and 11, and the common law of Massachusetts.

Presently at issue, therefore, is whether the aforementioned stipulated violations caused Addamax to suffer any damage and, if so, how much.

## IX.

### CAUSATION

■ It is not enough for Addamax to allege that its injury was caused by Defendants' antitrust violations. It must show that the violation was a "material cause" of its injury. *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corporation,* 79 F.3d 182, 194 (1st Cir.), *cert denied,* — U.S. —, 117 S.Ct. 294, 136 L.Ed.2d 214 (1996). Furthermore, "a fair degree of certainty is ... essential to show the causative relation of [D]efendants' misconduct and [Addamax's] injury." *Momand v. Universal Film Exchanges, Inc.,* 172 F.2d 37, 43 (1st Cir.1948), *cert denied,* 336 U.S. 967, 69 S.Ct. 939, 93 L.Ed. 1118 (1949).

■ There are a number of reasons a business may fail, even independent of the antitrust violations of others. A shift in consumer demand may cause unsustainable losses. The development of superior technology by a competitor may have a devastating im-

pact. Also, the business' own mismanagement may amount to a fatal corporate flaw. This court must decide whether Addamax has proven its claim that some of the harm it suffered was materially caused by Defendants' alleged unlawful actions, as opposed to circumstances for which Defendants bear no responsibility.

Addamax was never a profitable company. It consistently had cash flow problems and lacked the ability to raise sufficient capital. Its losses before the creation of OSF are persuasive evidence that Addamax' problems were not caused by Defendants, but by other forces. *See Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38 (2nd Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). And this court so finds.

As this court stated above, the computer industry is an inherently risky business. Technology advances quickly. Addamax started off too slowly, and when it finally caught up, it suffered from a malady faced by many companies in many fields—the customers did not want to buy its product.

When Addamax decided to enter the B–1 market, even before creation of its Blst Kit, AT & T was licensing a B–1 product and had announced the imminent creation of B–2 technology.[5] Some consumers, therefore, already had B–1 technology and did not need Addamax's product. AT & T was a recognized and respected player in the computer market and had tremendous resources, while Addamax was a small start-up with little capital. AT & T also had the distinct advantage of being the creator and licensor of UNIX.

By the time Addamax was ready to license its B–1st Kit, it faced even more competition—SecureWare. SecureWare had a simple, relatively inexpensive B–1 product that had been rated B–1 by the NCSC. Addamax had a complex, expensive B–1 product that had not yet received an evaluation from either the NCSC or the DIA. In other words,

---

5. Addamax introduced no evidence, created at the time of OSF's selection of SecureWare technology or soon thereafter, that suggests that OSF was the cause of Addamax's failure to find cus-

tomers. There are, however, a number of documents in that time frame that show Addamax blamed AT & T. (Alsberg Tr. T. 6:3; DX 2037; Alsberg Tr. T. 6:57; DX 2232).

SecureWare had a product that not only OSF preferred, but that the market preferred.

Lastly, Addamax, itself, showed poor judgment. It was late in its decision to enter the B-1 market. It underestimated the cost of producing such a product. It apparently ignored the fact that the product had a limited "shelf-life" and did not make efforts to produce the next level of technology in a timely manner—which might have created an increased demand for its B1st Kit. And it erred in its prediction as to what the market would want.

Beneath the layers of technical computer jargon is the undeniable fact that Addamax was an ineffective company trying to sell security software's version of the Ford Edsel. The fact that Addamax's woes coincided, in part, with the rise of OSF is mere coincidence and not the result of any alleged antitrust violations. The court, therefore, finds that Defendants' conduct was not a material cause of any of Addamax's losses.

## X.

### CONCLUSION

For the reasons mentioned above, the court holds that Addamax is not entitled to any damages.

An order will issue.