**ADDAMAX CORPORATION,**
**Plaintiff, Appellant,**

v.

**OPEN SOFTWARE FOUNDATION, INC.,**
**Digital Equipment Corporation and Hewlett–Packard Company, Defendants, Appellees.**

No. 97–1807.

United States Court of Appeals, First Circuit.

Heard Jan. 5, 1998.

Decided Sept. 4, 1998.

Alan R. Kusinitz with whom Samuel Adams, Keith C. Long, and Warner & Stackpole LLP were on brief for appellant.

James C. Burling with whom Michelle D. Miller, Hale and Dorr LLP, William L. Patton, Jane E. Willis, Ropes & Gray, Kevin P. Light and Choate, Hall & Stewart were on brief for appellees.

---

* Of the Northern District of Illinois, sitting by designation.

1. Because such software products emerge through test versions and then successive upgrades, it is difficult to pinpoint from the testimo-

Before BOUDIN, Circuit Judge, COFFIN, Senior Circuit Judge, and SHADUR,* Senior District Judge.

BOUDIN, Circuit Judge.

Addamax Corporation brought a federal antitrust suit against Open Software Foundation ("OSF"), Hewlett–Packard Company and Digital Equipment Corporation. After a bench trial limited to the issues of causation and damages, the district court found that antitrust violations, even if they were assumed to have occurred, were not a material cause of Addamax's failure in the line of business at issue. Addamax now appeals and we affirm.

We begin with a statement of those background facts that are more or less undisputed. Addamax was created by Dr. Peter A. Alsberg in 1986 and, in 1987, began to focus on developing security software for Unix operating systems. Unix is a very popular operating system for larger computers, and security software is a component that can be used with the operating system to restrict outside access to sensitive information and to restrict a particular user to information consistent with that user's security classification.

During this period, the National Computer Security Center, a division of the federal government's National Security Agency, rated security software, giving ratings (ranging from the most to the least secure) of A, B–3, B–2, B–1, C–2, C–1 and D. Addamax decided to produce B–1 software for Unix operating systems, a level of security demanded primarily by government users. During the years 1988–89, Addamax did develop B–1 security software for at least two different versions of Unix.[1]

While Addamax was trying to produce its security software, a different struggle was developing between AT & T—the inventor of Unix—and a number of major computer manufacturers. Although originally Unix had been freely licensed by AT & T, it

ny precisely when the "product" was on the market. The district court gave June 1989 as the date, but Addamax claims some licenses dating back to 1988; the discrepancy is not critical to our resolution.

appears that in the late 1980s AT & T began restricting its licenses in the face of various software modifications being introduced by individual licensees; and at the same time, AT & T began to develop a close working relationship with Sun Microsystems, a major microprocessor manufacturer. Other hardware manufacturers professed to fear that AT & T was trying to establish a single dominant version of Unix, intending to exclude the proprietary Unix variations from the market.

Accordingly, in May 1988, a number of important computer manufacturers—including defendants Hewlett–Packard and Digital Equipment Corp.—formed the Open Software Foundation as a non-profit joint research and development venture.[2] OSF registered under the National Cooperative Research Act of 1984, 15 U.S.C. § 4301, although that status has no direct importance for the issues before us. At least one of OSF's professed objectives was to develop an alternative Unix operating system, denominated OSF–1, as a competitor to the Unix system being developed jointly by AT & T and Sun Microsystems.

In 1989, while OSF–1 was still being developed, OSF decided that it should include security software at the B–1 level. At that time, only three companies—AT & T, Addamax and SecureWare, Inc.—were producing security software for the Unix system. On November 1, 1989, OSF sent a "request for technology" to Addamax and SecureWare, soliciting bids for a B–1 security component for the new OSF–1 system. Bids were submitted on November 27, 1989, and OSF selected SecureWare on December 22, 1989. There is some indication that the Addamax security software was more sophisticated— one witness agreed that the contrast was

between a Cadillac and a Chevette—but the Addamax price may also have appeared more substantial.[3] In any event, OSF–1 itself was never a very successful product.

Addamax continued to sell its own B–1 software for some period after losing the bid. Nothing prevented OSF "sponsors" (the founding members of OSF) or "members" (a great many other companies) from using Addamax security software for their own programs; and OSF sponsors and members were not the only potential buyers of Addamax's program. However, by 1991, Addamax began to phase out its B–1 security software, turning away new buyers so that it could devote its resources to the development of a new security software product, in which it appears that the company was successful.

In April 1991, Addamax filed a complaint in the district court against OSF, Hewlett–Packard and Digital, alleging various violations of federal and state antitrust law. As later amended, the complaint charged the defendants, together with other companies associated with OSF, with horizontal price fixing, boycott, and otherwise unlawful joint venture behavior in violation of the Sherman and the Clayton Acts, 15 U.S.C. §§ 1–2, 18. A central theme, although not the only one, was that the defendants had conspired to force down the price for security software below the free-market level and otherwise to limit or impair the ability of Addamax to compete as a supplier of security software.[4]

Considerable discovery was conducted, and in due course the defendants moved for summary judgment. In a thoughtful decision in May 1995, the district judge dismissed Addamax's per se claims on the ground that the alleged conduct of the defendants did not fit within the narrow categories for which per se treatment was appropriate; but the court

---

**2.** The phrase "joint venture" is often used to describe a venture, other than one engaged in naked per se violations (like a price fixing cartel), that represents a collaborative effort between companies—who may or may not be competitors—to achieve a particular end (*e.g.*, joint research and development, production of an individual product, or efficient joint purchasing).

**3.** SecureWare sought a single up-front payment of $3 million. Addamax requested an up-front payment of half this amount with royalties on

OSF–1 systems sold before 1992. If one were optimistic about OSF–1 prospects, Addamax's bid could have appeared higher, although not in retrospect.

**4.** Similar claims under Massachusetts antitrust law and a state law claim based on interference with business relations in violation of Massachusetts common law have not been separately pressed on this appeal and are not further discussed.

declined to dismiss Addamax's rule of reason claims, saying that the factual issues involving market power and anticompetitive effect were unsuitable for disposition on summary judgment. *Addamax Corporation v. Open Software Foundation, Inc.,* 888 F.Supp. 274 (D.Mass.1995).

Thereafter, the parties entered into a stipulation that the damage phase of the case would be tried first, on a jury waived basis, to determine "whether the defendants' conduct was a material cause of injury in fact to the plaintiff and, if so, the amount of damages." The stipulation further provided:

> Solely for purposes of this stipulation, the Court will assume that the defendants' conduct as alleged in the Amended Complaint and described in the non-damages portions of the expert reports of Drs. Comanor and Howe occurred and violates the federal and state law accounts. However, the Court will not assume, but will hear and take evidence on, whether there was injury in fact to the plaintiff as a result of that conduct and, if so, the amount of damages, which is the subject of this phase of the trial.

Trial was conducted over 12 days between November 18 and December 16, 1996. Addamax presented as live witnesses Dr. Alsberg, three experts, and a single Addamax customer. The defendants did not present live witnesses but did cross-examine extensively and relied on documentary submissions and deposition testimony.

In May 1997, the district court issued a decision concluding that the defendants' conduct was "not a material cause" of Addamax's losses. *Addamax Corporation v. Open Software Foundation, Inc.,* 964 F.Supp. 549, 555 (D.Mass.1997). The court found that the B–1 software market was a highly risky business, that Addamax's belatedly-offered product was "too expensive and too complex, and ... actually exceeded B–1 requirements." *Id.* at 553. The court said that Addamax faced severe competition from AT & T in the B–1 market and that SecureWare's product was "a cheaper and simpler" one. *Id.* Accordingly, the court held on the merits that Addamax was not entitled to any damages.

Addamax has now appealed and argues what in substance are three different points: that the district court erred in its factual determination that defendants' conduct was not a material cause of Addamax's losses in the B–1 security software market; that the stipulation, pertinent case law or both required the district court to find that the defendants' conduct had caused damage to Addamax; and that the court erred in dismissing the per se claims against the defendants. Because the legal issues set the frame for the factual ones, it is more convenient to take these claims in reverse order.

■ 1. As we explained in an earlier case, per se rules under section 1 of the Sherman Act have left only a couple of "serious candidates" for per se treatment: these include price or output fixing agreements (horizontal market division agreements are of essentially the same character) and *"certain group boycotts or concerted refusals to deal." U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 593 (1st Cir.1993). Since those words were written, the categories have been narrowed even further by the Supreme Court's decision to overrule *Albrecht v. The Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) and thereby to exclude from per se treatment vertical maximum resale price fixing agreements. *State Oil Co. v. Khan,* — U.S. —, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

Where a plaintiff proves conduct that falls within a per se category, nothing more is needed for liability; the defendants' power, illicit purpose and anticompetitive effect are all said to be irrelevant. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). But courts have been very careful to confine per se treatment to conduct of the type that is almost always actually or potentially anticompetitive and has no redeeming benefits (*e.g.,* reduced costs, increased competition) worthy of being weighed against the negative effects. *Broadcast Music, Inc. v. Columbia Broadcasting System,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Per se offenses remain very important—they include horizontal price fixing—but only for conduct that

fits squarely within the "ever narrowing per se niche." *U.S. Healthcare,* 986 F.2d at 593.

Joint venture enterprises like OFC, unless they amount to complete shams, *cf. Palmer v. BRG of Georgia,* 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990), are rarely susceptible to per se treatment. Where the venture is producing a new product—here, the OFC–1 software package—there is patently a potential for a productive contribution to the economy, and conduct that is strictly ancillary to this productive effort (*e.g.,* the joint venture's decision as to the price at which it will purchase inputs) is evaluated under the rule of reason.[5] This is so even if we accept, pursuant to the stipulation, the *arguendo* premise that OSF and those connected with it represented a large portion of the market for purchasing B–1 security software and represented a large portion of some kind of output market for integrated Unix software programs.

Addamax points to fragments of evidence that, assuming a full context were established, might or might not suggest that OSF was an aggressive response to the AT & T Sun venture and that Hewlett–Packard had a secret agenda to favor SecureWare over Addamax (for reasons that are never made quite clear), regardless of whether Addamax offered a superior product. None of the evidence pointed to by Addamax suggests that OSF–1 was other than a legitimate, if ultimately unsuccessful, product; and there is nothing to suggest that the ancillary decisions—what inputs to purchase, at what price, and from whom—were not legitimately related to this effort. In this context, flinging around terms like "cartel" and "boycott" do not convert a rule of reason claim into a per se one.

2. On the other hand, neither is a joint venture "per se" legal. Any joint venture, especially one that involves competitors, tends to be susceptible to attack under section 1's rule of reason—on the theory that the operations of the joint venture represent collaboration of the separate entities that own or control it. How far this theory can be pressed in the case of a truly integrated enterprise, whose "owners" were no more than stockholders, is a matter we need not pursue; we will assume here that the OSF joint venture, or some aspect of it, could be condemned under section 1 if the balance of harms and benefits tipped in favor of harms; questions of power and motive are primarily clues to such effects.[6]

At this point, Addamax's most straightforward claim would be that OSF's concentration of purchasing power in the supposed "market" for acquiring B–1 security software was so great that it imposed a significant risk of forcing prices below competitive levels, and that those risks outweighed any benefit from the venture or, more plausibly, that the venture could achieve those benefits in a less restrictive fashion, *i.e.,* without creating a substantial threat of monopsony pricing. Whether or not this theory could be proved, we are here assuming liability *arguendo.* The question remains whether Addamax established—either as a matter of law or based on the evidence—some causal connection between this assumed violation by defendants and Addamax's failure in the B–1 security software business.

Addamax first argues that the stipulation required the district court to find that the assumed violation was a material cause of injury to Addamax. Addamax's reading is contrary both to the explicit language of the stipulation and to its evident purpose. The

---

5. *Northwest Wholesale Stationers v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); *BMI v. CBS; NCAA v. Board of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). *United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), would probably be explained today by noting that the anticompetition restraint in question was considerably broader than necessary to make the joint venture work. *Topco,* 1972 WL 669 (N.D.Ill.1972) (on remand), 414 U.S. 801, 94 S.Ct. 116, 38 L.Ed.2d 39 (1973)

(affirming judgment). *Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1 (1st Cir.1979), cited by Addamax on this issue, involved naked horizontal restraints that were not ancillary to any actual joint venture.

6. Addamax's briefs in this court do not separately develop the asserted claims under section 2 and section 7; and in any event it is not clear on the present facts why those sections would give Addamax any additional help.

stipulation said that the first phase of the bench trial was to determine "whether" defendants' conduct was "a material cause of injury in fact" to Addamax (and, if so, the amount of damages), assuming *arguendo* that a violation of law had occurred. Pointedly, the stipulation went on to emphasize that although the existence of a violation was to be assumed, the court "will not assume, but will hear and take evidence on," the question whether there was "injury in fact to the plaintiff as a result of" the attributed conduct.

Certainly both Addamax's complaint and its experts *asserted* that the alleged conduct has caused injury, but this was not part of the facts to be assumed *arguendo*. The stipulation did not assume the truth of the complaint, but only that defendants had engaged in the "conduct" alleged in the complaint. Under the stipulation, the reports of Addamax's experts were assumed to be true only in describing the conduct and not its consequences; that is made clear by the reference in the stipulation to assuming the truth of the "non damages portions of the expert reports."

Addamax's more interesting argument is its claim that the case law, and the economic theory that underlies it, require a conclusion that the conduct assumed *arguendo* to comprise a violation must have caused injury to Addamax. The broadest version of this proposition is Addamax's claim that under the rule of reason, conduct is condemned only because it has an anticompetitive effect. Therefore, Addamax argues, there must have been some injury to it, and the only question that remains is to calculate the amount of damages.

A more specific version of the argument, also advanced, is that in this very case the complaint's straightforward charge is that the defendants engaged in an agreement that had the effect of reducing price for B–1 security systems and since Addamax was a provider of B–1 security programs, it necessarily was injured by a reduction in price. An alternative version is Addamax's claim that the joint venturers were engaged in suppressing demand for their own output— Unix programs like OSF–1 embodying B–1

software—and this in turn reduced the demand, and presumably therefore price, volume or both, for suppliers of the input.

It is technically an overstatement to say that actual anticompetitive impact is a requirement of liability in a rule-of-reason case. True, as a practical matter, most courts would be unlikely to condemn an otherwise legitimate joint venture absent some showing of anticompetitive effect. But in principle, a sufficiently high *risk* of an anticompetitive effect, coupled with marginal benefits (or none at all that could not be achieved through an easily available less restrictive alternative) might justify condemnation under the rule of reason.

But all this is beside the point. Even if we assume that the OSF purchasing consortium was capable of exercising monopsony power directly or through coordination of its sponsor/members' actions, it does not follow that Addamax was a victim or that the alleged below-market price offered by the consortium materially affected Addamax. The only formal purchase by OSF involving Addamax was based on the November 1989 request for technology, in which SecureWare was the successful supplier. If below market price was paid, SecureWare, and not Addamax, was directly injured.

To be sure, Addamax claims that its sales opportunities were indirectly curtailed. While the OSF sponsors and members were free to purchase B–1 security programs from anyone they wanted on an individual basis, Addamax claims that winning the OSF–1 sale would have amounted to a valuable OSF endorsement, spurring other sales. But it is hard to see this loss as a consequence of monopsony pricing. In all events, Addamax's claim of secondary injury reduces itself to an issue of fact—not an issue that can be taken as resolved by stipulation or case law.

■ 3. As a preface to its factual claims, Addamax asserts that the district court's decision recognizes a "defense" of mismanagement. A plaintiff's mismanagement is not a bar to recovery where an antitrust violation is a material cause of injury. *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d at 14 n. 21. But mismanagement is certainly

relevant to the factual question whether the antitrust violation had such an effect or whether the plaintiff is entirely the cause of its own failure. *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42–45 (2d Cir.1986).

We turn then to the question whether the district court erred in its factual determination that Addamax's inability to succeed in its efforts to sell its B–1 security program for Unix more widely was materially caused by the defendants' conduct. On this issue, Addamax bore the burden of proof at trial. *Irvin Industries, Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244 (2d Cir. 1992). On appeal, the district court's findings and ultimate conclusion of fact are entitled to stand unless found to be clearly erroneous. *La Esperanza De P.R., Inc. v. Perez Y Cia. De Puerto Rico, Inc.*, 124 F.3d 10, 15 (1st Cir.1997).

Addamax is mistaken in its suggestion that the district court misunderstood the legal standard for causation: quite unlike *Haverhill Gazette Co. v. Union Leader Corp.*, 333 F.2d 798 (1st Cir.1964), the district judge properly asked whether the defendants' assumed conduct had been a substantial or material cause of the losses claimed by Addamax. Although we there cautioned against an unduly rigid view of causation in computing damages once injury had been established, *id.* at 808 n. 16, nothing in the opinion relieved the plaintiff from making the statutory showing (fully satisfied in *Haverhill*) that the violation had caused at least some injury to the plaintiff's business or property. 15 U.S.C. § 15.

Here, the district court was presented with two competing versions of reality. Addamax's witnesses took the view that Addamax developed a superior B–1 product and its failure to succeed resulted from defendants' machinations which forced down the price of the product to sub-competitive levels and suppressed output for Unix software incorporating B–1 security programs. In some places, Addamax describes itself as the target, and elsewhere as the accidental victim, of a larger conspiracy directed against AT & T.

The defense version, which the district court adopted, was derived from defense de-

positions, cross-examination of the plaintiffs' experts and numerous documents. In this view, Addamax engaged in risky entry into a market dominated by AT & T, an established supplier of B–1 security software for Unix; the Addamax system was oversophisticated, expensive, arrived late, and never received the important certification from NSA's National Computer Security Center. And, in a market characterized by ever-changing demands, AT & T's promised development of a follow-on B–2 system made the market for B–1 security software for Unix inherently risky and in some measure transitional. There is nothing inherently implausible about either version; everything depends on the evidence.

In fairness to Addamax, the factual analysis in its brief represents exactly the kind of detailed critique of the evidence that fairly presents the question whether the district judge's findings are adequately supported by the record. Addamax identifies specific findings with which it disagrees, cites to record evidence it thinks was misconstrued, furnishes citations to the record for propositions it advances, points to counterveiling evidence that it says the district judge ignored and misinterpreted. In this respect, the brief deserves to be taken seriously, and we have done so.

But while in a few instances the district court may have misinterpreted an exhibit or ignored some fact that softens or qualifies the inference it draws, Addamax's own critique is filled with one-sided versions of events and refusals to confront evidence in support of the district court's findings. What emerges from our own review of the record is that the district court had evidence to support each of its key findings: that the business was a risky one; that Addamax entered late, with a high-priced, overbuilt and uncertified product; that AT & T and SecureWare, in different ways, posed major problems for Addamax; that many of Addamax's problems, including losses of customers, had begun before the OSF selection of SecureWare; and that changes in market conditions proved to be adverse to Addamax.

Further, the evidence is largely derived from Addamax itself, including the deposition

and trial testimony of Dr. Alsberg. The risky nature of Addamax's venture was stressed in its disclosures to investors, and the delays and cost overruns concerning its B–1 product emerge from its own records; it was Addamax that expressed concern with competition from AT & T and especially its ability to offer a smooth transition to its own promised B–2 offering; and the defection of existing and prospective customers to AT & T, apparently before OSF–1, can be traced through Addamax records. The district court did not commit "clear error" in finding the facts in favor of defendants.

Addamax attacks the district court's findings as inadequate under Fed. R.Civ.P. 52(a). By this, it means not that the explicit findings were wrong (it argues this elsewhere) but that the findings are either not sufficiently detailed or did not affirmatively find specific facts helpful to Addamax or did not address evidence that favored Addamax where there was evidence both ways. But the district court was not required to make findings on every detail, was not required to discuss all of the evidence that supports each of the findings made, and was not required to respond individually to each evidentiary or factual contention made by the losing side. *Knapp Shoes, Inc. v. Sylvania Shoe Co.*, 15 F.3d 1222, 1228 (1st Cir.1994); *Applewood Landscape & Nursery Co. v. Hollingsworth*, 884 F.2d 1502, 1503–04 (1st Cir.1989).

There is no mechanical rule for determining the exact level of findings required by Rule 52(a). In this instance, the district court made explicit intermediate findings (*e.g.*, competition from AT & T, the strengths and weaknesses of Addamax's product) making clear the bases for its ultimate finding on causation; and, with the help of counsel, it has been relatively easy to discern the evidence underlying these key findings. The district court could have written a 200–page decision on this case, but the far more compact assessment it made was entirely adequate under Rule 52(a).

*Affirmed.*