# United States Court of Appeals
## For the First Circuit

No. 02-2391

EASTERN FOOD SERVICES, INC.,

Plaintiff, Appellant,

v.

PONTIFICAL CATHOLIC UNIVERSITY SERVICES ASSOCIATION, INC.,
and COCA COLA PUERTO RICO BOTTLERS, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, <u>U.S. District Judge</u>]

Before

Boudin, <u>Chief Judge</u>,

Torruella and Howard, <u>Circuit Judges</u>.

<u>Pedro Jiménez</u> with whom <u>Katarina Stipec-Rubio</u> and <u>Correa, Collazo, Herrero, Jiménez & Fortuño</u> were on brief for appellant.
<u>Luis A. Oliver-Fraticelli</u> with whom <u>Diego A. Ramos</u> and <u>Fiddler, González & Rodríguez PSC</u> were on brief for appellee Pontifical Catholic University Services Association, Inc.
<u>Néstor M. Méndez-Gómez</u> with whom <u>Oreste R. Ramos</u> and <u>Pietrantoni Méndez & Alvarez LLP</u> were on brief for appellee Coca Cola Puerto Rico Bottlers.

January 20, 2004

**BOUDIN**, **Chief Judge**.  This is an appeal by Eastern Food Services, Inc. ("Eastern") from the dismissal of its antitrust suit.  The defendants in the district court were Pontifical Catholic University of Puerto Rico Services Association, Inc., ("University Services") and Coca Cola Puerto Rico Bottlers, Inc. ("Coca Cola").  Because dismissal was on the complaint, we take the factual allegations of the complaint as true for purposes of this appeal.  Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 5-6 (1st Cir. 2002).

Eastern is a company based in San Juan, Puerto Rico, engaged in distributing food and beverage products in Puerto Rico; this includes sales through cafeteria operations and food and beverage machines.  Pontificia Universidad Católica de Puerto Rico is a university based in Ponce, Puerto Rico; University Services is a related entity that provides ancillary services for the university and has control over its cafeteria and other food distribution points.

In 1997, Eastern and University Services entered into a three-year contract, extendable to five years, whereby Eastern agreed to operate the cafeteria at the university and was given, for specified payments, the exclusive concession (with a few narrow exceptions) for other food and beverage distribution inside the university.  Eastern alleges that in 1998, in order to secure a donation from Coca Cola to the university, University Services

-2-

allowed Coca Cola to place its own food and beverage machines on the campus and told Eastern to have the machines it was using removed.

There were negotiations between the parties as to this and other matters. Ultimately, University Services terminated the contract, claiming that Eastern had breached its provisions in various respects; Eastern made similar claims against University Services. Asserting that it made large investments in reliance upon the contract, Eastern brought the present suit in federal district court in 1999 against both University Services and Coca Cola.

Although the complaint asserts contract, tort, and other claims under local law (and University Services filed a counterclaim based on breach of contract), our concern is solely with Eastern's claim based upon section 1 of the Sherman Act, 15 U.S.C. § 1 (2000). This claim alleged a conspiracy by the two defendants, through unfair business practices, to eliminate competition by Eastern in the supply of food and beverage service within the university. This was, according to the complaint, unlawful per se and under the rule of reason.

The district court dismissed the antitrust claim on the merits. The ruling most important to this appeal was that the complaint failed to allege a valid geographic market; the district judge said that Eastern's alleged geographic market--the

-3-

university--was "extremely narrow" and not "large enough so as to constitute an economically significant area of commerce." The local law claims were dismissed without prejudice to their assertion in Puerto Rico's courts. This appeal followed.

Our review of a dismissal for failure to state a claim is de novo. Martin, 284 F. 3d at 5-6. In addition to accepting as true the facts alleged in the complaint, we draw reasonable inferences in favor of the non-moving party. Id. Nevertheless, we conclude that this is essentially a contract dispute with possible attendant tort claims; and it is not a plausible antitrust case, however tempting may be the lure of treble damages and attorney's fees.

In substance, Eastern alleges that it had from the university, through its services auxiliary, something close to an exclusive contract to provide food services on the university campus, and that after receiving a large donation for the university from Coca Cola, University Services broke the contract in order to transfer to Coca Cola exclusive rights to a part of Eastern's domain, namely, the vending machine portion of the business on the campus. Indulging all inferences in favor of Eastern, we will assume that Coca Cola was complicit in the breach.

The line is not always clear between antitrust violations and ordinary business wrongs, such as breach of contract or tortious interference. Indeed, both antitrust and ordinary

-4-

contract or tort claims may sometimes arise out of the same body of conduct, see Hayes v. Solomon, 597 F.2d 958, 973 (5th Cir. 1979), cert. denied, 444 U.S. 1078 (1980); IIIA Areeda & Hovenkamp, Antitrust Law, ¶ 782a (1996); imagine a near monopolist who burns down the plant of his only competitor. But antitrust claims are concerned not with wrongs directed against the private interest of an individual business but with conduct that stifles competition. Brown Shoe Co. v. United States, 370 U.S. 294, 344 (1962).

From the outset, Eastern's description of what happened raises warning flags for anyone familiar with antitrust law. The university, like most landlords, controls who may set up shop on its premises. It could act as the sole on-campus supplier of food and beverages, allow multiple suppliers, or give exclusive access to one supplier. Here, before the dispute, Eastern was virtually the sole supplier of food and beverages; after, Coca Cola has exclusive control of the vending machine portion of the business.

In all events, antitrust doctrine does not operate by purely ad hoc judgments as to whether an action adds to or detracts from competition. Section 1 of the Sherman Act makes unlawful contracts, combinations and conspiracies in restraint of trade and the courts have developed algorithms for implementing this generalization. The easiest way is for the plaintiff to show a "per se" violation, that is, that the challenged conduct falls within a small set of acts regarded by courts as sufficiently

dangerous, and so clearly without redeeming value, that they are condemned out of hand--that is without a showing of wrongful purpose, power or effect. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940).

Almost the only important categories of agreements that reliably deserve this label today are those among competitors that amount to "naked" price fixing, output restriction, or division of customers or territories. Augusta News Co. v. Hudson News Co., 269 F.3d 41, 47 (1st Cir. 2001).[1] Agreements between a supplier and a buyer as to a minimum resale price remain per se unlawful, id., but that category is a narrow one. In this case Eastern invokes a different category of agreements sometimes labeled per se, namely, concerted refusals to deal or group boycotts. E.g., Fashion Originators Guild of Am., Inc. v. FTC, 312 U.S. 457, 465-67 (1941).

As to this last category, the label is deceptive because lots of arrangements that might literally be described as agreements not to deal are not per se unlawful. A common arrangement that involves an agreement not to deal but is far from unlawful per se is the exclusive dealing contract (e.g., a sole supplier contract, a exclusive territorial franchise for an outlet). Such arrangements

---

[1]"Naked" means unconnected with any redeeming larger enterprise. See White Motor Co. v. United States, 372 U.S. 253, 263 (1963). Compare Northwest Wholesale Stationers v. Pacific Stationery & Printing Co., 472 U.S. 284, 295-98 (1985); Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 20-21 (1979).

can be attacked under the rule of reason--_i.e._, on their facts--but are not per se violations.  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).

Those refusals to deal arrangements that are treated as per se violations are "horizontal," that is, they are agreements between competitors.  See U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 593-94 (1st Cir. 1993).  (Even then, not all such horizontal arrangements are subject to per se treatment or necessarily violate the antitrust laws, e.g., Northwest Stationers, 472 U.S. at 295-98.).  An entity that grants an exclusive franchise is ordinarily in a vertical, not a horizontal, relationship with the grantee.  XI Hovenkamp, Antitrust Law ¶ 1800a (1998).

What is alleged here is nothing other than an exclusive dealing arrangement by which one supplier--Coca-Cola--is given the sole right by the university to supply and stock vending machines on campus.[2]  Eastern was itself the beneficiary of just such a contract--indeed, a broader one since it included other on-campus food distribution--until it was terminated.  There might be circumstances in which exclusivity was unlawful for Coca-Cola but

---

[2]Eastern's concern with the fact that Coca Cola may have paid up-front a large sum for the contract in the form of a supposed donation to the university is a red herring.  Whether the university is compensated by up-front payments, rent, or royalties (or by construction work allegedly wrung out of Eastern) affects not the competitive impact but merely the form and amount of compensation for the exclusive contract.

not for Eastern; but in neither case does such a contract fall into the category of a per se violation.

To show an antitrust violation in the transfer of exclusive rights from Eastern to Coca Cola, Eastern had to commit itself to show that the new arrangement would have anti-competitive effects outweighing the legitimate economic advantages that it might provide. U.S. Healthcare, 986 F.2d at 595; see Fraser v. Major League Soccer, 284 F.3d 47, 59 (1st Cir. 2002), cert. denied, 537 U.S. 885 (2002). This is usually a demanding and fact-intensive process, cf. Tampa Elec. Co., 365 U.S. at 329, which is why plaintiffs almost always allege a per se violation where they can do so. But plaintiffs are free to urge per se and non-per se theories at the same time. U.S. Healthcare, 986 F.2d at 593.

Virtually always, anti-competitive effects under the rule of reason require that the arrangement or action in question create or enhance market power--meaning the power to control prices or exclude competition. IIA Areeda & Hovenkamp, Antitrust Law, ¶ 501 (2d ed. 2002). This is not necessarily enough to condemn the conduct--benefits may outweigh detriments, see Northwest Wholesale Stationers, 472 U.S. at 295-98 (1985); Broadcast Music, Inc., 441 U.S. at 20-21--but absent market power there is ordinarily no detriment and no reason to engage in any weighing. Oksanen v. Page Mem'l Hosp., 945 F.2d 696, 709 (4th Cir. 1991), cert. denied, 502 U.S. 1074 (1992).

-8-

Thus, the identification of market power is ordinarily the first step in any rule of reason claim under section 1. U.S. v. Visa, U.S.A., Inc., 344 F.3d 229, 238 (2d Cir. 2003); Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656, 666 (7th Cir. 1987), cert. denied, 484 U.S. 977 (1987). This in turn requires the identification of some economic market in which power can be measured and the consequences of the act or transaction assessed. Indeed, "virtually all courts applying the rule of reason require the plaintiff to define the product and geographic market in which competition is allegedly restrained . . . ." VII Areeda, Antitrust Law ¶ 1503b, at 376 (1986).

So how is market power to be assessed? As to power over price, the conventional way is to determine whether the relevant actor or combination has a sufficient percentage share of a "relevant market" to give it or them power to raise price over cost without losing so many customers as to defeat the effort. Todd v. Exxon Corp., 275 F.3d 191, 199 (2d Cir. 2001). Where exclusion rather than exploitation is the concern, market share figures help gauge the potential impact of restrictive conduct on suppliers or purchasers. See Tampa Elec. Co., 365 U.S. at 327. A defendant's high share is only a presumptive basis for inferring market power (entry barriers to the market may be very low); but a low share is almost always an indication that the defendant lacks market power.

Here, perhaps University Services has power in an economic market: after all, it can set the prices charged students for food simply by making itself the sole distributor. In fact, whether it has power to raise price to a non-competitive level depends on how easy it is for students to find other nearby food suppliers. In any event, if the university has power to charge high prices to those on campus, it can be exploited without regard to whether it contracts with Coca Cola or Eastern or does the job itself.

By contrast, competition in the market to supply vending services--note that this is a _different_ market--could in theory be affected by a long-term exclusive franchise contract between the university and Coca Cola: suppose Eastern were the only food distributor in Puerto Rico beside Coca Cola and the latter's long-term contracts with various outlets deprived Eastern of the minimum number necessary to its survival. U.S. Healthcare, 986 F.2d at 595. Even then, one would have to consider whether Eastern could feasibly create _new_ outlets by itself. Posner, Antitrust Law 251-52 (2d ed. 2001).

In all events, so far as Eastern's competitive access to customers is concerned, the key question in market definition is what other customers Eastern and its competitors can supply and with what. Here, Eastern described in its complaint the product as vending machine sales and the geographic area of competition as the university campus. The district court in dismissing the complaint

thought that the former was not a meaningful product and the latter was too small and narrowly defined to be a realistic geographic market.

We can confine ourselves here to the geographic market and assume arguendo that supplying food or beverages through vending machines might be a legitimate product for purposes of market analysis. See Allegheny Pepsi-Cola Bottling Co. v. Mid-Atlantic Coca-Cola Bottling Co., 690 F.2d 411, 412 n.1 (4th Cir. 1982). We also put aside any suggestion that vending sales in the university are too small in dollar terms to be of interest to the Sherman Act. Perhaps Section 1 includes a de minimis dollar requirement based on the interstate commerce element of the offense, Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 780-81 (7th Cir. 1994) (Posner, J.); IA Areeda & Hovenkamp, Antitrust Law, ¶ 266e, at 296-300 (2d ed. 2000); but such a requirement, even if it exists, is low, Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 329 n.10, 329-33 (1991), and nothing before us suggests that the dollar volume of vending sales on campus is trivial.

The more important question is the percentage of the market represented by the university. Consider that if food and beverage vending within the university is but a modest fraction of all food and beverage vending distribution in Ponce and Eastern can serve the Ponce area, then foreclosure of the campus segment of the market, even by giving Coca Cola the university franchise for a long

-11-

period, cannot prevent Eastern from distributing through other vending machine outlets. This is just another way of saying that, except in special circumstances, a contract restricting a small percentage of a larger available market will have no anti-competitive effect on that market.

Here, to put matters in a nutshell, the district court said that the university was obviously a small portion of the distribution market, measured geographically. Eastern says that the district court had no business making this determination on a motion to dismiss; there is, after all, nothing in the complaint that establishes that Eastern and other vending machine suppliers operate in a larger market. Eastern also says that even if the district court could reject the university as a valid economic market for distribution, Eastern was still entitled to a fall-back opportunity to conduct discovery to identify some broader but more plausible market in which foreclosure might still be significant.

As to the first issue, the district court was entitled to take notice that Ponce is a major city in Puerto Rico and, as a matter of common experience, to recognize that food and beverage machines are customarily accessible at a host of public and business points within cities. The idea that one university campus represents even a majority of the vending machine sales in a large city is so improbable that Eastern's own brief makes no such

suggestion.[3]  Quite possibly (note Eastern's location in San Juan) distribution is an island-wide business, but it is enough that it is at least municipal.

Eastern does say that <u>for students and faculty</u> the campus may be a geographic market in which they purchase snacks and beverages, and we would not rule out this possibility without more information about student habits and nearby locations.  See <u>Morales-Villalobos</u> v. <u>Garcia-Llorens</u>, 316 F.3d 51, 54-55 (1st Cir. 2003).  But, as noted, <u>this</u> student-faculty market, even if real, is already captive to the university and a change in exclusive distributors does not further restrict it.  Eastern, by contrast, could be affected by being excluded from the campus, but it is a distributor which, if it can serve the university, is also capable of serving other outlets in Ponce.

At oral argument, Eastern's counsel said that his client did not need to identify the geographic and product market in the complaint and could have merely alleged anti-competitive effects in "a valid economic market."  Even if this were so--and different views might be taken on this issue--it would be no excuse for

---

[3]In fact, the students represent at most a few percentage points in Ponce's population.  According to its web cite, Ponce (Puerto Rico's second largest city) has about 194,000 people; and a web site for colleges (xap.com) reports the student population of the university as 7,150.  Conceivably, such precise information amounts to adjudicative facts subject to Fed. R. Evid. 201; but in any event the data bear out the background inferences drawn in the text.

sustaining a complaint that had shown itself to be inadequate based on the drafter's candor.  Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir. 1995) (Posner, J.).  The time of judges and lawyers is a scarce resource; the sooner a hopeless claim is sent on its way, the more time is available for plausible cases.

This brings us to Eastern's fall-back position; as already noted, Eastern argues that even if its initial claim was doomed, it was entitled to add new allegations to the complaint, conduct discovery or both--aimed at developing other market definitions or theories of antitrust violation.  Specifically, Eastern says that in opposing the motion to dismiss, it told the district court that it might eventually urge that the market was all of Ponce or even island-wide, depending upon what discovery revealed.

This argument has several variations, and we start with the easiest, namely, the possibility of amending the complaint. Once the adversary has answered, amendment is no longer allowed as of right, Fed. R. Civ. P. 15(a), but in general permission is liberally granted where there is no prejudice.  FDIC v. Consol. Mortgage and Fin. Corp., 805 F.2d 14, 16 (1st Cir. 1986).  It is often granted not only pretrial but after a dismissal for failure to state a claim where the court thinks that the case has some promise and there is some excuse for the delay.  See 6 Wright & Miller, Federal Practice and Procedure § 1488, at 652-69 (2d ed. 1990).

Refusals to allow amendment are reviewed only for abuse of discretion, Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994), but district judges do not customarily aim to defeat valid claims. Here, little had occurred at the time of dismissal beyond the filing of motion papers. It is a fair guess that if Eastern had moved to amend the complaint after the dismissal and had offered the court some hope of an amendment raising a plausible antitrust claim, amendment would have been allowed. But Eastern did not move to amend and, even now, it neither has a plausible case nor understands what one would require.

Despite some initial confusion, today exclusive dealing contracts are not disfavored by the antitrust laws. Compare Standard Oil Co. of Cal. v. United States, 337 U.S. 293, 306-07, 313-14 (1949), with Tampa Elec. Co., 365 U.S. at 334, and Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring). Rather, it is widely recognized that in many circumstances they may be highly efficient--to assure supply, price stability, outlets, investment, best efforts or the like--and pose no competitive threat at all. XI Hovenkamp ¶¶ 1810-1814b. Ordinarily, such agreements pose a threat to competition only in

very discrete circumstances,[4] and much sweat and tears have gone into identifying these criteria.  Id. at ¶¶ 1802-1807, 1821.

The best example of a possible threat to competition exists where a market is already heavily concentrated and long-term exclusive dealing contracts at either the supplier or distribution end foreclose so large a percentage of the available supply or outlets that entry into the concentrated market is unreasonably constricted.  Even here there will normally be no serious effects in certain conditions (e.g., the contracts are for  short terms, new entry at the supplier or outlet business allegedly restrained is easy), but, at a minimum, substantial foreclosure is essential and existing concentration important.  See U.S. Healthcare, 986 F.2d at 597; Barr Labs. v. Abbott Labs., 978 F.2d 98, 111 (3d Cir. 1992); cf. XI Hovenkamp ¶ 1821b-c, at 160-64.

There is no indication that Eastern has any hope of showing substantial foreclosure in a properly defined market.  Yes, Eastern might well show that supply of products through vending machines is a geographic market that is municipal, regional or island-wide: likely it is one of these.  But Eastern does not

_____

[4]See Jefferson Parish, 466 U.S. at 45 (O'Connor, J., concurring) ("Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal."); Roland Machinery Co. v. Dresser Indus., Inc., 749 F.2d 380, 394 (7th Cir. 1984) (Posner, J.) ("[A] plaintiff must prove . . . that an exclusive dealing arrangement is . . . . likely to keep at least one competitor of the defendant from doing business in a relevant market.").

remotely suggest that so many potential outlets are foreclosed to it or other competitors by long-term exclusive dealing contracts or other tactics that survival or new entry is infeasible. Being in the distributor business, it ought to know enough to make such an allegation if it were true.

This brings us to the separate and more difficult subject of allowing discovery without insisting upon an amendment. The federal rules adopt so-called notice pleading--a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)--and the case books are full of generalizations seemingly helpful to Eastern: that evidence need not be pled; that discovery is available both to refine claims and to support them; and that claims will be allowed to go forward upon a wrong theory or no theory at all so long as some set of facts encompassed by the complaint would allow recovery.[5]

Yet the cases also say that it is not enough merely to allege a violation in conclusory terms, that the complaint must make out the rudiments of a valid claim, and that discovery is not for fishing expeditions.[6] Often, such sets of dueling over-statements

---

[5]E.g., Morales-Vallellanes v. Potter, 339 F.3d 9, 14 (1st Cir. 2003); Kiley v. Ratheon Co., 105 F.3d 734, 735 (1st Cir. 1997); Am. Nurses Ass'n v. State of Illinois, 783 F.2d 716, 727 (7th Cir. 1986).

[6]E.g., Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996); McCoy v. Ma. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991), cert. denied, 504 U.S. 910 (1992); Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988).

-17-

mean that the pertinent variables are too numerous, and the circumstances too various, to reduce the law to a formula; usually, the outcome turns on matters of degree. In all events, discovery is an expensive and burdensome process, and at every stage is subject to control as a matter of sound judicial judgment.

Nothing here suggests that discovery would be remotely productive, apart from the random (and insufficient) possibility that rummaging through Coca Cola's files would produce evidence of some wholly unknown violation. What Eastern mainly says it wants to discover is information about market definition, a matter on which it should already have a good grasp since it is in the business. The further circumstances that would be needed to make out a half-way decent exclusive dealing claim (e.g., widespread foreclosure and concentration) are ones whose existence is not even hinted at by Eastern.

In this case, four years after the filing of the complaint, there continues to be no hint of a coherent and promising antitrust claim. The case remains what it was from the start: a contract and tort case concerned not about whether an economic market will become less competitive but about which of two companies will have exclusive access to supply vending machine food and beverages on a single campus. Eastern may or may not have decent claims under local law but it has no claim arising under the Sherman Act.

-18-

<u>Affirmed</u>.